**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
                                :
FOOD KING, INC.,                :    CIVIL ACTION NO. 04-1500 (MLC)
                                :
        Plaintiff,              :    MEMORANDUM OPINION
                                :
        v.                      :
                                :
NORKUS ENTERPRISES, INC.,       :
et al.,                         :
                                :
        Defendants.             :
                                :
```

**COOPER, District Judge**

Plaintiff, Food King, Inc. ("Food King"), commenced this action against (1) Foodtown, Inc. ("Foodtown"), (2) Norkus Enterprises, Inc. ("NEI"), (3) Gerry Norkus ("Norkus"), (4) Joseph Azzolina, Sr., (5) Ronald Dickerson, (6) Peter Lavoy, (7) Edward Paczkowski, (8) Jack Pytluk, (9) Michael Zimmerman, (10) Stephen Bokser, (11) Sydney Katz, (12) David Maniaci, (13) the Estate of G. William Michas, Jr., (14) Harp Marketing Corp. ("Harp"), (15) PSK Supermarkets, Inc. ("PSK"), (16) Victor Laracca ("Laracca"), (17) Oliva Supermarkets, LLC ("Oliva"), and (18) V&V, Inc. ("V&V"). (Dkt. entry no. 56, 2d Amend. Compl.) Food King alleges violations of the Lanham Act (count one), breach of fiduciary duty (count two), shareholder oppression (count three), intentional misrepresentation (count four), and tortious interference with prospective economic advantage (count five). (Id.)

The Court, on May 16, 2006, granted PSK's motion to dismiss the second amended complaint insofar as asserted against it, and terminated PSK as a party to this action.  (Dkt. entry no. 92, 5-16-06 Ord., at 2.)[1]  Similarly, on December 13, 2006, the Court granted Harp's motion to dismiss count 4 of the second amended complaint insofar as asserted against it, and terminated Harp as a party to this action.  (Dkt. entry no. 123, 12-13-06 Ord.)  That same day, the Court granted a motion by Laracca, Oliva, and V&V to dismiss count 5 of the second amended complaint, which was only asserted against those defendants.  (Dkt. entry no. 125, 2d 12-13-06 Ord.)  No claims remain against Oliva or V&V.

Foodtown, NEI, Norkus, Joseph Azzolina, Sr., Ronald Dickerson, Peter Lavoy, Edward Paczkowski, Jack Pytluk, Michael Zimmerman, Stephen Bokser, Sydney Katz, David Maniaci, and the Estate of G. William Michas, Jr. (collectively, the "Foodtown Defendants") separately move for summary judgment in their favor on count 1, count 2, count 3, and count 4 of the second amended complaint pursuant to Federal Rule of Civil Procedure ("Rule") 56.  (Dkt. entry nos. 198, 199, 200, 201; see dkt. entry nos. 128, 133, 137, 144.)  Further, Laracca separately moves for

---

[1] The Court terminated PSK without prejudice and granted Food King leave to file a third amended complaint by June 19, 2006, "amending only Count IV insofar as it alleges a claim against PSK Supermarkets, Inc., pursuant to N.J.S.A. § 14A:12-7." (Id.)  However, Food King did not file a third amended complaint in this action.

summary judgment in his favor on count 1, count 2, count 3, and count 4 of the second amended complaint pursuant to Rule 56. (Dkt. entry no. 202.)[2]  In support of his separate motion, Laracca relies on the papers submitted by the Foodtown Defendants in support of their separate motions.  (See id.)  For the reasons stated herein, the Court will (1) grant the Foodtown Defendants' motion for summary judgment on Food King's Lanham Act claim (count 1), (2) grant the Foodtown Defendants' separate motion for summary judgment on Food King's shareholder oppression claim (count 3), (3) grant the Foodtown Defendants' separate motion for summary judgment on Food King's intentional misrepresentation claim (count 4), (4) deny the Foodtown Defendants' separate motion for summary judgment on Food King's breach of fiduciary duty claim (count 2), (5) grant the parts of Laracca's separate motion seeking summary judgment on Food King's Lanham Act claim (count 1), shareholder oppression claim (count 3), and intentional misrepresentation claim (count 4), and (6) deny the part of Laracca's separate motion seeking summary judgment on Food King's breach of fiduciary duty claim (count 2).

---

[2]  Laracca filed separate notice of motions with respect to count 1, count 2, count 3, and count 4 of the second amended complaint.  Nevertheless, because all four notice of motions are found at docket entry number 202, the Court will treat the relief sought by Laracca as one motion.

**BACKGROUND**

**I.    Relevant Parties**

Foodtown is a New Jersey corporation with approximately 17 Class A shareholders, who are each considered a Foodtown "Member".  (Foodtown Defs. Stmt. of Undisp. Facts in Support of Mot. for S.J. on Count 1 of 2d Amend. Compl. ("Foodtown 1st Stmt. of Facts"), at ¶ 1; Food King Counter-Stmt. of Mat. Facts in Opp. to Foodtown Defs. Mot. for S.J. on Count 1 ("Food King 1st Counter-Stmt. of Facts), at ¶ 1.)  Each Member operates one or more supermarkets under the Foodtown banner, and Foodtown provides them with certain services and accumulative purchasing power.  (Foodtown 1st Stmt. of Facts, at ¶ 2.)[3]  NEI is a Foodtown Member, which operates 7 Foodtown stores.  (Foodtown 1st Stmt. of Facts, at ¶ 6; Food King 1st Counter-Stmt. of Facts, at ¶ 6.)  Food King is also a Foodtown Member, which operates 2 Foodtown stores.  (Id.; Foodtown Defs. Stmt. of Undisp. Facts in Support of Mot. for S.J. on Count 2 of 2d Amend. Compl. ("Foodtown 2d Stmt. of Facts"), at ¶ 1; Food King Counter-Stmt. of Mat. Facts in Opp. to Foodtown Defs. Mot. for S.J. on Count 2 ("Food King 2d Counter-Stmt. of Facts), at ¶ 1.)  At all times relevant to the second amended complaint, Food King's president

---

[3]  Food King argues that NEI conjoins the "Norkus name" with Foodtown's trademarks, and thus, it operates outside the "Foodtown banner".  (Food King 1st Counter-Stmt. of Facts, at ¶ 2.)

4

was Ronald Ginsberg ("Ginsberg"), its vice president of finance was Michael Ginsberg, and its vice president of operations was Marc Ginsberg.  (Foodtown 2d Stmt. of Facts, at ¶ 2; Food King 2d Counter-Stmt. of Facts, at ¶ 2.)  Ginsberg formerly served as Foodtown's chief executive officer, and thus, was a member of the executive committee.  (Foodtown Defs. Stmt. of Undisp. Facts in Support of Mot. for S.J. on Count 3 of 2d Amend. Compl. ("Foodtown 3rd Stmt. of Facts"), at ¶ 99; Food King Counter-Stmt. of Mat. Facts in Opp. to Foodtown Defs. Mot. for S.J. on Count 3 ("Food King 3rd Counter-Stmt. of Facts"), at ¶ 99.)

Manyfoods, Inc. ("Manyfoods") was also a Foodtown Member at all times relevant to the second amended complaint.  (Foodtown 2d Stmt. of Facts, at ¶ 3; Food King 2d Counter-Stmt. of Facts, at ¶ 3.)  Manyfoods's president, William Michas, was formerly a member of Foodtown's board of directors.  (Foodtown 2d Stmt. of Facts, at ¶ 3; Food King 2d Counter-Stmt. of Facts, at ¶ 3.)  Finally, Nicholas Markets, Inc. ("Nicholas Markets") was a Foodtown Member that withdrew from the cooperative effective November 23, 1998.  (Foodtown 3rd Stmt. of Facts, at ¶ 17; Food King 3rd Counter-Stmt. of Facts, at ¶ 17.)  However, by unanimous vote of a quorum of the Members, Nicholas Markets was readmitted as a Member on March 21, 2000 subject to specific conditions, including Nicholas Markets agreeing to execute and deliver an unsecured promissory note in favor of Foodtown in the principal amount of $350,000.

(Dkt. entry no. 170-8, Cicero Aff., Ex. S, 3-29-00 Foodtown
Letter to Maniaci, at 1.)

## II.   The Twin County Grocers Action

Twin County Grocers ("Twin County") was another wholesale
supermarket cooperative whose members included Foodtown's
Members.  (Foodtown 3rd Stmt. of Facts, at ¶ 8; Food King 3rd
Counter-Stmt. of Facts, at ¶ 8.)  Twin County filed a bankruptcy
petition in 1998.  (Foodtown 3rd Stmt. of Facts, at ¶ 8; Food
King 3rd Counter-Stmt. of Facts, at ¶ 8.)  During a meeting held
on December 15, 1998, Foodtown's board of directors unanimously
passed a resolution stating, <u>inter</u> <u>alia</u>, that (1) Foodtown would
reimburse losses incurred by its Members "as a result of Local
863 strike activity at their retail stores and as a result of
their demand loans to Twin County . . . it being intended that
such losses will be borne by all Members of Foodtown in the same
proportion as that to which Members of Foodtown would be entitled
to distributions", (2) losses incurred as a result of Local 863
picketing shall be determined by an independent public accounting
firm, which will take each Member's loss of retail volume from
the picketing and multiply it by an assumed gross profit of 25%,
and (3) losses incurred in connection with demand loans made to
Twin County shall be determined by taking the unpaid balance of
the demand loan and adding legal fees and related expenses
incurred in collecting the demand loan, but excluding any

interest on such demand loan.   (Dkt. entry no. 170-7, Cicero
Aff., Ex. P, 12-15-98 Foodtown Bd. of Dirs. Meeting Minutes, at
8-9.)

     Twin County, operating as a debtor-in-possession under the
United States Bankruptcy Code, commenced an adversary proceeding
against its former directors and certain of its member stores in
February of 1999, seeking to recover alleged preference payments,
payments due on accounts receivable, penalties for early store
withdrawals, and damages for breach of fiduciary duty (the "Twin
County Action").   (Foodtown 3rd Stmt. of Facts, at ¶ 9; Food King
3rd Counter-Stmt. of Facts, at ¶ 9.)   Foodtown and certain of its
Members were named as defendants in the Twin County Action.
(Foodtown 3rd Stmt. of Facts, at ¶ 9; Food King 3rd Counter-Stmt.
of Facts, at ¶ 9.)   Accordingly, Foodtown and 11 of the Members
that were named as defendants, including Food King, formed a
defense group to share the costs of defending against and
asserting counterclaims in the Twin County Action (the "Defense
Group").   (Foodtown 3rd Stmt. of Facts, at ¶ 10; Food King 3rd
Counter-Stmt. of Facts, at ¶ 10.)   However, Twin County sued 4
other Members separately, and these Members decided to defend
their separate adversary proceedings on their own and without
participating in the Defense Group.   (Foodtown 3rd Stmt. of
Facts, at ¶ 10; Food King 3rd Counter-Stmt. of Facts, at ¶ 10.)

The Defense Group eventually entered into a settlement in the Twin County Action pursuant to which the Defense Group agreed to, inter alia, pay $6,483,333 to Twin County.  (Foodtown 3rd Stmt. of Facts, at ¶ 26; Food King 3rd Counter-Stmt. of Facts, at ¶ 26.)  The Defense Group incurred $1,201,611 in legal and other miscellaneous costs related to settling the Twin County Action.  (Foodtown 3rd Stmt. of Facts, at ¶ 26; Food King 3rd Counter-Stmt. of Facts, at ¶ 26.)  DiGiorgio Corporation had previously extended a demand loan to the Defense Group, which partially funded these defense and settlement-related costs.  (Foodtown 3rd Stmt. of Facts, at ¶ 28; Food King 3rd Counter-Stmt. of Facts, at ¶ 28.)  Foodtown advanced both the defense and settlement costs that were not covered by the DiGiorgio Corporation demand loan and the interest due on the demand loan to the Defense Group, until a final allocation of the defense and settlement costs among the Defense Group could be determined.  (Foodtown 3rd Stmt. of Facts, at ¶ 29; Food King 3rd Counter-Stmt. of Facts, at ¶ 29.)  However, Robert Linkin ("Linkin"), Foodtown's corporate counsel, advised Foodtown's executive committee that in his opinion, "as a matter of fundamental principles of New Jersey corporate law, Foodtown simply [could not] accept substantive liability for those claims that [were] grounded in the recovery of preferences and the collection of accounts receivable."  (Foodtown 3rd Stmt. of Facts, at ¶ 41; Food King 3rd Counter-

8

Stmt. of Facts, at ¶ 41.)   Thus, Linkin proposed that the entire
settlement amount, less contributions from Twin County's director
and officer liability insurance carrier, should be allocated
among the members of the Defense Group and not covered in full or
in part by Foodtown.  (Foodtown 3rd Stmt. of Facts, at ¶ 42; Food
King 3rd Counter-Stmt. of Facts, at ¶ 42.)

Foodtown's executive committee proposed to the Members that
Foodtown accept economic responsibility for the four types of
costs and unrecoverable claims associated with the Twin County
Action.  (Foodtown 3rd Stmt. of Facts, at ¶ 43; see Food King 3rd
Counter-Stmt. of Facts, at ¶ 43.)  The executive committee's
recommendation was met with significant resistance from certain
Members, and thus, the executive committee asked Norkus and
Ginsberg to attempt to negotiate a deal with these Members.
(Foodtown 3rd Stmt. of Facts, at ¶¶ 46-47; Food King 3rd Counter-
Stmt. of Facts, at ¶¶ 46-47.)  As a result of these negotiations,
the executive committee proposed to Foodtown's board of directors
that Foodtown assume $14,004,800 worth of economic responsibility
for certain types of costs and expenses incurred by or on behalf
of Foodtown Members in connection with the Twin County Action,
and certain losses and duplicate liabilities incurred by Foodtown
Members as a result of Twin County's bankruptcy proceedings.
(Foodtown 3rd Stmt. of Facts, at ¶¶ 48-49 (noting that Linkin
presented the executive committee's proposal to the board of

directors in a memorandum dated September 18, 2001); Food King
3rd Counter-Stmt. of Facts, at ¶¶ 48-49 (same).)

Foodtown's board of directors, at a meeting held on
September 25, 2001, resolved, inter alia, that (1) Foodtown's
proposed assumption of costs and expenses incurred by, or on
behalf of, its Members in connection with the Twin County Action,
as well as losses and duplicate liabilities suffered by its
Members as a result of Twin County's bankruptcy, are approved and
adopted (the "Resolution"), (2) Foodtown's officers are
authorized to take all necessary actions to implement the
Resolution, including obtaining financial resources, and (3)
"implementation of the foregoing Resolution shall be specifically
conditioned upon . . . the approval and ratification of the
Resolution by the unanimous vote of those Members of Foodtown
which are entitled to vote on the Resolution".  (Dkt. entry no.
137-4, Gannon Cert., Ex. 28, Excerpt from 9-25-01 Foodtown Bd. of
Dirs. Meeting Minutes, at 8-9.)

"In the months and year that followed, a series of hurdles
were encountered in effectuating the Resolution."  (Foodtown 3rd
Stmt. of Facts, at ¶ 54; see Food King 3rd Counter-Stmt. of
Facts, at ¶ 54.)  Due to continued resistence, Foodtown's
executive committee and board of directors eventually abandoned
the Resolution and returned to attempting to allocate the defense
and settlement costs arising from the Twin County Action among

10

the Defense Group only.  (Foodtown 3rd Stmt. of Facts, at ¶ 58;
see Food King 3rd Counter-Stmt. of Facts, at ¶ 10.)  A special
meeting of the board of directors was convened on September 10,
2002, to consider a proposal for allocating the defense and
settlement costs arising from the Twin County Action amongst the
Defense Group.  (Foodtown 3rd Stmt. of Facts, at ¶¶ 60-61; Food
King 3rd Counter-Stmt. of Facts, at ¶¶ 60-61.)  At this meeting,
the board of directors approved and adopted a resolution
"containing an allocation schedule as the final binding
allocation of the Twin County litigation costs."  (Foodtown 3rd
Stmt. of Facts, at ¶ 70; Food King 3rd Counter-Stmt. of Facts, at
¶ 70.)[4]  Food King asserts that this final allocation was not
fair or equitable, and this was not an issue for Foodtown's board
of directors to resolve.  (Food King 3rd Counter-Stmt. of Facts,
at ¶ 29.)

Linkin sent a memorandum dated October 22, 2002 to the
Members describing the September 10, 2002 resolution and

_____

[4] Also at this meeting, Foodtown's board of directors
considered forgiving the Nicholas Markets $350,000 promissory
note to Foodtown.  (Foodtown 3rd Stmt. of Facts, at ¶ 88; Food
King 3rd Counter-Stmt. of Facts, at ¶ 88 (explaining, however,
that David Maniaci, on behalf of Nicholas Markets, voted in favor
of the proposed allocation and the board then voted to forgive
the Nicholas Markets $350,000 obligation to Foodtown).)
Ultimately, Foodtown's board passed a resolution releasing the
Nicholas Markets $350,000 obligation to Foodtown.  (Dkt. entry
no. 137-4, Gannon Cert., Ex. 9, 9-10-02 Bd. of Dirs. Meeting
Minutes, at 4.)  All directors, except Ginsberg, voted in favor
of releasing the Nicholas Markets note.  (Foodtown 3rd Stmt. of
Facts, at ¶ 95; Food King 3rd Counter-Stmt. of Facts, at ¶ 95.)

corresponding allocation schedule, and stating that this
resolution would be submitted to the Members for consideration
and approval. (Foodtown 3rd Stmt. of Facts, at ¶ 72; see Food
King 3rd Counter-Stmt. of Facts, at ¶ 72.) Food King sent a
letter to Foodtown's president and counsel stating that it
objected to the allocation of the defense and settlement costs
and requesting a meeting with Foodtown's management. (Foodtown
3rd Stmt. of Facts, at ¶ 74; Food King 3rd Counter-Stmt. of
Facts, at ¶ 74.) Foodtown's executive committee considered Food
King's letter, but later recommended to the board of directors
that the proposed allocation approved in the September 10, 2002
resolution should be submitted to the Members for their approval.
(Foodtown 3rd Stmt. of Facts, at ¶¶ 75-76.) Food King sent a
letter dated November 26, 2002 to the other Members stating its
objections to the proposed allocation of the defense and
settlement costs and asking the Members to vote "no" with respect
to the September 10, 2002 resolution. (Foodtown 3rd Stmt. of
Facts, at ¶ 77; Food King 3rd Counter-Stmt. of Facts, at ¶ 77.)
Nevertheless, during a special meeting held on December 2, 2002,
the Members approved the September 10, 2002 resolution.
(Foodtown 3rd Stmt. of Facts, at ¶ 80; Food King 3rd Counter-
Stmt. of Facts, at ¶ 80 (arguing, however, that several members
were given concessions in exchange for voting in favor of the
September 10, 2002 resolution).)

12

## III. The Sale of the Manyfoods Stores

Foodtown's by-laws state that after a Member enters into a contract to sell or transfer any of its stores "to any transferee (other than another Member of the Corporation who is in good standing) that will operate some or all of the assets so acquired as retail food markets", the Member must offer the transaction in writing to "the Corporation" on the same price, terms, and conditions. (Dkt. entry no. 133-4, Gannon Cert., Ex. 5, 5-23-00 Amend. & Restated By-Laws, at 20.) The selling Member must also provide Foodtown with a certified copy of the executed contract to which the offer refers. (Id.) Foodtown has 60 days from the date it receives a transaction offer from a Member to accept the offer in writing. (Id.) If it chooses not to accept the offer within 60 days, the Member is free to complete the transaction with the third party on either the same terms and conditions or terms and conditions more favorable to the Member. (Id.) However, the transaction must close within 150 days of the expiration of Foodtown's right of first refusal. (Id.) The by-laws state that nothing in the section discussing this right of first refusal prevents or precludes any Member "from competing with Foodtown to acquire another Member's stock, assets, or stores." (Id. at 23.)

Manyfoods experienced financial difficulties in the summer of 2001. (Foodtown 2d Stmt. of Facts, at ¶ 9; Food King 2d

13

Counter-Stmt. of Facts, at ¶ 9.)  On September 10, 2001, Manyfoods entered into a non-binding letter of intent with Pathmark Stores, Inc. ("Pathmark") for the sale of the Manyfoods store in Whippany, New Jersey for $4,000,000.  (Foodtown 2d Stmt. of Facts, at ¶ 16; Food King 2d Counter-Stmt. of Facts, at ¶ 16.) Linkin circulated this letter of intent to the Foodtown Members to determine whether any Member had an interest in purchasing the Whippany store.  (Foodtown 2d Stmt. of Facts, at ¶ 19; Food King 2d Counter-Stmt. of Facts, at ¶ 19.)  No Member expressed an interest in the Whippany store, and thus, Linkin informed Manyfoods that Foodtown was waiving its right of first refusal. (Foodtown 2d Stmt. of Facts, at ¶ 22; Food King 2d Counter-Stmt. of Facts, at ¶ 22.)

   Manyfoods notified Foodtown on November 9, 2001 that Pathmark had decreased its purchase price offer to $3,000,000 and issued a new letter of intent.  (Foodtown 2d Stmt. of Facts, at ¶ 23; Food King 2d Counter-Stmt. of Facts, at ¶ 23.)  Linkin circulated the new letter of intent to the Members.  (Foodtown 2d Stmt. of Facts, at ¶ 24; Food King 2d Counter-Stmt. of Facts, at ¶ 24.)  When no Member expressed an interest in the Whippany store under the terms and conditions set forth in the new letter of intent, Foodtown sent a letter to Manyfoods on November 15, 2001, waiving its right of first refusal.  (Foodtown 2d Stmt. of Facts, at ¶ 25; Food King 2d Counter-Stmt. of Facts, at ¶ 25.)

Manyfoods ultimately sold its Whippany store to Pathmark.  (See Foodtown 2d Stmt. of Facts, at ¶ 10; Food King 2d Counter-Stmt. of Facts, at ¶ 10.)

Manyfoods also sought to sell its store in Cedar Knolls, New Jersey in the fall of 2001.  (Foodtown 2d Stmt. of Facts, at ¶ 27; Food King 2d Counter-Stmt. of Facts, at ¶ 27.)  On November 16, 2001, WAL & Associates, Inc. ("WAL") issued a non-binding letter of intent to Manyfoods stating that it intended to purchase the Cedar Knolls store for $1,500,000.  (Foodtown 2d Stmt. of Facts, at ¶ 28; Food King 2d Counter-Stmt. of Facts, at ¶ 28.)  Linkin circulated the WAL letter of intent to the Members to determine if any Member was interested in purchasing the Cedar Knolls store.  (Foodtown 2d Stmt. of Facts, at ¶ 29; Food King 2d Counter-Stmt. of Facts, at ¶ 29.)  On November 24, 2001, Ginsberg and Michael Ginsberg contacted Foodtown's president and told him that Food King was interested in purchasing the Cedar Knolls store.  (Foodtown 2d Stmt. of Facts, at ¶ 37; Food King 2d Counter-Stmt. of Facts, at ¶ 37.)  Thus, on November 26, 2001, Ginsberg and Michael Ginsberg met with Linkin and Foodtown's president.  (Foodtown 2d Stmt. of Facts, at ¶ 38; Food King 2d Counter-Stmt. of Facts, at ¶ 38.)  Food King asserts that (1) during this meeting Linkin advised Ginsberg and Michael Ginsberg that they must meet all terms and conditions of the WAL letter of intent, and (2) Ginsberg and Michael Ginsberg "viewed the

November 26, 2001 meeting as an exercise of the right of first refusal on Food King's part." (Food King 2d Counter-Stmt. of Facts, at ¶ 38.) The parties agree that during a meeting the following day, Food King reached an oral agreement with Manyfoods for the purchase of the Cedar Knolls store on the same terms and conditions set forth in the WAL letter of intent. (Foodtown 2d Stmt. of Facts, at ¶ 39; see Food King 2d Counter-Stmt. of Facts, at ¶ 39-40.) Food King contends that because it exercised its right of first refusal based on the WAL letter of intent, and because its lawyer was drafting an agreement based on that letter of intent, Manyfoods was precluded from continuing to negotiate with other interested parties. (Food King 2d Counter-Stmt. of Facts, at ¶ 40.)

WAL increased its purchase price offer by $500,000 and sent a new letter of intent dated November 30, 2001 to Manyfoods. (Foodtown 2d Stmt. of Facts, at ¶ 42.) Linkin circulated the new WAL letter of intent to the Members to determine whether any Member had an interest in purchasing the Cedar Knolls Store on the terms and conditions set forth therein. (Id. at ¶ 43; Food King 2d Counter-Stmt. of Facts, at ¶ 43.) On December 7, 2001, Manyfoods and WAL entered into a bulk sales contract. (Foodtown 2d Stmt. of Facts, at ¶ 44; Food King 2d Counter-Stmt. of Facts, at ¶ 44.) The Foodtown Defendants argue that Manyfoods, by letter dated December 7, 2001, "extended a formal offer in

writing to Foodtown which triggered Foodtown's right of first refusal under its By-laws for the very first time with respect to the sale of the Cedar Knolls store." (Foodtown 2d Stmt. of Facts, at ¶ 45.)  Food King argues, in contrast, that "the right of first refusal under the By-laws with respect to the Cedar Knolls store was triggered before the December 7, 2001 letter from Manyfoods to Foodtown." (Food King 2d Counter-Stmt. of Facts, at ¶ 45.)

Foodtown's board of directors met on December 11, 2001 to discuss the proposed agreement between WAL and Manyfoods. (Foodtown 2d Stmt. of Facts, at ¶ 46; Food King 2d Counter-Stmt. of Facts, at ¶ 46.)  During that meeting, Ginsberg advised the Board that Food King would object if the board waived Foodtown's right of first refusal in connection with the December 7, 2001 agreement between WAL and Manyfoods because, among other reasons, Manyfoods and Food King previously reached an agreement in principle for the sale of the Cedar Knolls store to Food King at the $1,500,000 purchase price.  (Foodtown 2d Stmt. of Facts, at ¶ 46; Food King 2d Counter-Stmt. of Facts, at ¶ 46.)  Linkin recommended to the Foodtown executive committee that they proceed with reviewing WAL's membership application because the financial situation of Manyfoods was very poor, but the board did not make a decision regarding whether Foodtown should waive its right of first refusal.  (Foodtown 2d Stmt. of Facts, at ¶ 48; Food King

17

2d Counter-Stmt. of Facts, at ¶ 48.)  In a memorandum dated
December 26, 2001, Linkin told Ginsberg, inter alia, that
Foodtown's right of first refusal is not triggered until an
agreement with a non-Member transferee its reduced to a written
document, executed, and delivered to Foodtown, and thus, "[t]he
only deal for the Cedar Knolls [store] as to which the right of
first refusal [had] been triggered [was] the executed WAL
agreement".  (Foodtown 2d Stmt. of Facts, at ¶ 49 (alterations in
original); see Food King 2d Counter-Stmt. of Facts, at ¶ 49
(noting that Linkin also stated that his understanding of the
interaction between Food King and Manyfoods was not sufficiently
complete to draw a conclusion regarding whether Food King had an
enforceable contract with Manyfoods).)

        Foodtown's board of directors held a special meeting on
January 3, 2002 to consider an expedited waiver of Foodtown's
right of first refusal with respect to the written agreement
between WAL and Manyfoods.  (Foodtown 2d Stmt. of Facts, at ¶ 51;
Food King 2d Counter-Stmt. of Facts, at ¶ 51.)  Food King asked
that the Board postpone addressing the right of first refusal
issue because the 60-day acceptance period had not expired.
(Foodtown 2d Stmt. of Facts, at ¶ 52; Food King 2d Counter-Stmt.
of Facts, at ¶ 52.)  Further, during the special meeting,
Ginsberg and Michael Ginsberg asked the board to provide economic
assistance to Food King so that it could purchase the Cedar

Knolls store for the $2,000,000 purchase price currently being offered by WAL.  (Foodtown 2d Stmt. of Facts, at ¶ 53; Food King 2d Counter-Stmt. of Facts, at ¶ 53.)  Foodtown's board of directors called another special meeting on January 8, 2002 in response to Food King's request for economic assistance. (Foodtown 2d Stmt. of Facts, at ¶ 54; Food King 2d Counter-Stmt. of Facts, at ¶ 54.)  The board ultimately voted to provide Food King with $25,000 of promotional money that could be used to purchase products to help rebuild the Cedar Knolls store, in addition to standard new store promotions and 3 months of free advertising.  (Foodtown 2d Stmt. of Facts, at ¶ 54; Food King 2d Counter-Stmt. of Facts, at ¶ 54.)  Nevertheless, in a letter dated January 16, 2002, Food King advised Foodtown that it was not interested in purchasing the Cedar Knolls store under the terms of the December 7, 2001 agreement between WAL and Manyfoods.  (Foodtown 2d Stmt. of Facts, at ¶ 55; Food King 2d Counter-Stmt. of Facts, at ¶ 55.)

Foodtown's board of directors held another special meeting on January 18, 2002 during which Linkin informed the board members of Food King's January 16, 2002 letter.  (Foodtown 2d Stmt. of Facts, at ¶ 56; Food King 2d Counter-Stmt. of Facts, at ¶ 56.)  A quorum of Foodtown's board then voted unanimously to waive Foodtown's right of first refusal with respect to the December 7, 2001 agreement between WAL and Manyfoods.  (Foodtown

2d Stmt. of Facts, at ¶ 57; Food King 2d Counter-Stmt. of Facts, at ¶ 57.)  However, Manyfoods informed Foodtown on February 1, 2002 that Foodtown's delay in waiving its right of first refusal had exacerbated its financial problems, and thus, Manyfoods and WAL were considering an alternative transaction in which WAL would make a $500,000 equity investment in Manyfoods in exchange for 2/3 stock in Manyfoods.  (Foodtown 2d Stmt. of Facts, at ¶ 59; Food King 2d Counter-Stmt. of Facts, at ¶ 59.)

Foodtown's board of directors considered this transaction, which would enable Manyfoods to remain a Member, at a special meeting held on February 5, 2002.  (Foodtown 2d Stmt. of Facts, at ¶¶ 59-60; Food King 2d Counter-Stmt. of Facts, at ¶ 60.)  The following day, Linkin sent a memorandum to the board of directors stating, inter alia, that he (1) was "seriously troubled by the dialogue that took place and the conclusions that were reached (or not reached, as the case may be) at [the previous day's meeting", (2) believed that the only provision in Foodtown's by-laws that would allow the board to block WAL's proposed capital infusion in Manyfoods was the redemption right that Foodtown holds pursuant to Article III, Section 7, because the provisions on share transfers and the right of first refusal are not applicable to this situation, and (3) could not understand why the board would choose to block the capital infusion because if Manyfoods "disappears under the weight of its own financial

20

troubles, [the board's] ability to collect the money it owes Foodtown will be compromised, if not eliminated." (Dkt. entry no. 133-4, Gannon Cert., Ex. 42, 2-6-02 Linkin Mem., at 1.) Foodtown's board reconvened on February 7, 2002 and voted unanimously to approve WAL's equity investment in Manyfoods. (Foodtown 2d Stmt. of Facts, at ¶ 63; see Food King 2d Counter-Stmt. of Facts, at ¶ 63.)

**IV.  Changes to Foodtown's Board of Directors, Executive Committee, and Other Committees**

Food King and its principals became increasingly unhappy about Foodtown's operations and began threatening litigation against Foodtown, its board of directors, and certain of its Members. (See Foodtown 3rd Stmt. of Facts, at ¶¶ 96-97; see Food King 3rd Counter-Stmt. of Facts, at ¶¶ 96-97.) According to the Foodtown Defendants, the other members of Foodtown's executive committee believed Ginsberg "had become disruptive and an obstructionist and had ceased acting as a positive leader of and toward the advancement of Foodtown." (Foodtown 3rd Stmt. of Facts, at ¶ 99.) Accordingly, at a Foodtown executive session meeting held on July 23, 2002 with a quorum of directors present, a vote was taken to remove Ginsberg as both vice chairman and chief executive officer of Foodtown. (Foodtown 3rd Stmt. of Facts, at ¶ 101; Food King 3rd Counter-Stmt. of Facts, at ¶ 101 (arguing that Ginsberg was removed in retaliation for speaking up about things he discovered as Foodtown's CEO).)

21

A majority of Foodtown's board of directors, on October, 20, 2003, approved a resolution reducing the board from 10 directors to 9 directors.  (Foodtown 3rd Stmt. of Facts, at ¶ 104; see Food King 3rd Counter-Stmt. of Facts, at ¶ 104.)  During the 2003 annual membership meeting, each of Foodtown's 10 incumbent directors stood for reelection with only 9 available positions.  (Foodtown 3rd Stmt. of Facts, at ¶ 105; Food King 3rd Counter-Stmt. of Facts, at ¶ 105.)  Ginsberg was not reelected.  (Foodtown 3rd Stmt. of Facts, at ¶ 105; Food King 3rd Counter-Stmt. of Facts, at ¶ 105 (stating that (1) the board of directors meeting and the annual membership meeting occurred on the same day, and thus, the Members voting by proxy did not know that the slate of 10 directors they previously received could not all be elected, and (2) "[h]ad the Members voting by proxy known they could only select nine of the ten nominated Directors, they may have voted differently than the holders of the proxies").)  Thereafter, Food King commenced this action on March 29, 2004.  (See dkt. entry no. 1, Compl.)  During a closed session held before the regular meeting on April 20, 2004, Foodtown's board of directors unanimously concluded that Food King's representatives should no longer serve on Foodtown committees or attend committee meetings.  (Foodtown 3rd Stmt. of Facts, at ¶ 109; Food King 3rd Counter-Stmt. of Facts, at ¶ 109.)  Food King contends that Foodtown's board of directors' decision to remove it from

22

committees constitutes improper retaliation for Food King commencing this action.  (Food King 3rd Counter-Stmt. of Facts, at ¶ 109.)

## V.   Foodtown's Insurance Program

Foodtown, and thereafter, FIS Group LLC, has administered a comprehensive general liability program for Foodtown and certain participating Members, including Food King.  (Foodtown Defs. Stmt. of Undisp. Facts in Support of Mot. for S.J. on Count 4 of 2d Amend. Compl. ("Foodtown 4th Stmt. of Facts"), at ¶ 8; Food King Counter-Stmt. of Mat. Facts in Opp. to Foodtown Defs. Mot. for S.J. on Count 4 ("Food King 4th Counter-Stmt. of Facts), at ¶ 8; 2d Amend. Compl., at 43-44.)  Foodtown's insurance committee established a method of allocating the insurance premiums to Foodtown and the Member participants based on relative sales volumes during each policy period.  (Foodtown 4th Stmt. of Facts, at ¶ 9; see Food King 4th Counter-Stmt. of Facts, at ¶ 9 (stating that after the first year, the premium was allocated based on a combination of relative sales volumes and relative claims experience).)  Initially, participating Members simply reported their estimated sales volumes at the beginning of the policy period and their actual sales volumes at the end of the policy period.  (Foodtown 4th Stmt. of Facts, at ¶ 10; Food King 4th Counter-Stmt. of Facts, at ¶ 10.)  However, for the policy period ending on March 31, 2002, Foodtown's insurance committee asked

the participating Members to support their actual sales reports with either sales or income tax returns.  (Foodtown 4th Stmt. of Facts, at ¶ 11; Food King 4th Counter-Stmt. of Facts, at ¶ 11.)

Due to complaints and opposition, Norkus recommended to Foodtown's board of directors that "submission of sales tax returns be waived for the current year, and that on a going forward basis Members would be required to provide documentation to support their sales figures."  (Foodtown 4th Stmt. of Facts, at ¶¶ 12-16; see Food King 4th Counter-Stmt. of Facts, at ¶¶ 12-16.)  Thus, Foodtown implemented the requirement that copies of sales or income tax returns must be provided beginning in 2004.  (Foodtown 4th Stmt. of Facts, at ¶ 20; Food King 4th Counter-Stmt. of Facts, at ¶ 20.)

## DISCUSSION

### I.   Summary Judgment Standard

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  The movant bears the initial burden of showing that there is no genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant has met this prima facie burden, the non-movant must "set out specific facts showing a genuine issue for trial."  Fed.R.Civ.P. 56(e)(2).  A non-movant

must present actual evidence that raises a genuine issue of material fact and may not rely on mere allegations.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

The Court must view the evidence in the light most favorable to the non-movant when deciding a summary judgment motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  At the summary judgment stage, the Court's role is "not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Anderson, 477 U.S. at 249.  Under this standard, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient [to defeat a Rule 56(c) motion]; there must be evidence on which the jury could reasonably find for the [non-movant]."  Id. at 252.  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. at 247-48 (emphasis in original).  A fact is material only if it might affect the action's outcome under governing law.  Id. at 248.  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (internal citations omitted).

## II.   Summary Judgment Standard Applied Here

### A.   Count 1 (Lanham Act)

Food King, in count 1, asserts that "Foodtown has the exclusive right to several valuable marks in New Jersey, the United States and Puerto Rico." (2d Amend. Compl., at 6.)  Food King further asserts, inter alia, that (1) Foodtown's Members have used the Foodtown marks for more than 48 years, (2) Foodtown's Amended and Restated By-Laws require Members to apply to Foodtown's board of directors for permission to use a Foodtown mark in a manner that is not expressly authorized by the Foodtown Trademark Utilization Manual, (3) in 1994, NEI and Norkus "began infringing upon the Foodtown marks and violating corporate By-Laws and cooperative policies by adding the word 'Norkus', and in some cases the phrase 'Your Hometown Grocer Since 1935', to its use of the Foodtown mark", and (4) NEI and Norkus have also infringed Foodtown's "Fresh and Friendly" mark by adding a "Norkus Fresh" logo to such mark in NEI's advertising circular. (Id. at 7-13.)[5]  The Foodtown board of directors rejected Food King's request that it take action and require NEI and Norkus to cease its infringing activity, particularly operating its stores under the name "Norkus Foodtown". (Id. at 17.)  Food King

---

[5] The only specific infringing activity Food King alleges with respect to Norkus is that he carries a "Norkus Foodtown" badge. (Food King. Br. in Opp. to Foodtown Defs. Mot. for S.J. on Count 1 ("1st Food King Br."), at 14.)

contends that NEI's and Norkus's misuse of the Foodtown marks is likely to cause customer confusion or mistake, as well as dilution and disparagement of the distinctive quality of the Foodtown marks, in violation of the Lanham Act.  (Id. at 18-20.)

The Lanham Act prohibits the commercial use, "without the consent of the registrant", of any "reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive". 15 U.S.C. § 1114(1)(a) (emphasis added) (discussing trademark infringement).  Further, Section 43(a)[6] of the Act provides:

> Any person who, on or in connection with any goods or services, . . . uses in commerce any word, term, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which–
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another, or as to the origin sponsorship, or approval of his or her goods, services or commercial activities by another person
> . . . .
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

---

[6] Before the Lanham Act was codified, the contents of Section 1125(a) appeared in Section 43(a) of Public Law 79-489. See 79 Pub.L.No. 489, 60 Stat. 427 (1946).  As a result, this provision is commonly referred to as Section 43(a) of the Lanham Act.

15 U.S.C. § 1125(a)(1) (discussing unfair competition).  To
prevail on a trademark infringement or unfair competition claim
under the Lanham Act, the plaintiff must show that (1) the mark
is valid and legally protectable, (2) the plaintiff owns the
mark, and (3) the defendant's use of a similar mark is likely to
create confusion concerning the origin of the plaintiff's goods
or services.  Freedom Card, Inc. v. J.P. Morgan Chase & Co., 432
F.3d 463, 470 (3d Cir. 2005); see Kos Pharm., Inc. v. ANDRX
Corp., 369 F.3d at 700, 708-09 (3d Cir. 2004); Fisons
Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d 466, 472 (3d
Cir. 1994).  Validity and legal protectability are proven, if a
mark was federally registered and placed upon the principal
register.  See 15 U.S.C. § 1115(a).

　　"A likelihood of confusion exists when consumers viewing the
mark would probably assume that the product or service it
represents is associated with the source of a different product
or service identified by a similar mark."  Freedom Card, Inc.,
432 F.3d at 470.  A plaintiff can assert that there is a
likelihood of "direct confusion" or a likelihood of "reverse
confusion".  Id.  A direct confusion claim arises when "a junior
user of a mark attempts to free-ride on the reputation and
goodwill of the senior user by adopting a similar or identical
mark."  Id.  In contrast, reverse confusion arises "when a
larger, more powerful company uses the trademark of a smaller,

less powerful senior owner and thereby causes likely confusion as to the source of the senior user's goods or services." Id. at 471.

The Court finds that Foodtown, the registered owner of the Foodtown marks, implicitly consented to NEI's and Norkus's use of the Foodtown marks when it amended its by-laws on March 23, 2000, to, inter alia, remove prior restrictions on the use of the Foodtown marks, including restrictions on conjoining, "in the expectation that a Foodtown Trademark Utilization Manual would be developed that would govern the use of the marks" and "would prescribe reasonable (and, hopefully, appropriately flexible) standards for the use of the marks". (Dkt. entry no. 129, Gannon Cert., Ex. 19, 5-13-00 Linkin Mem., at 2-3; see id., Ex. 5, 5-23-00 Foodtown Amend. & Restated By-Laws, at 24-27.)  Further, Foodtown and its board of directors expressly consented to NEI's and Norkus's use of the Foodtown marks, including its "Norkus Foodtown" conjoined logo.  (See Foodtown Defs. Br. in Support of Mot. for S.J. on Count 1, at 4.)[7]  Thus, we conclude that NEI's and Norkus's use of the Foodtown marks was "with consent of the registrant".  Nevertheless, even if Foodtown did not consent to NEI's and Norkus's use of the marks, Food King has failed to

_____

[7] The Court also notes that, although they were aware of NEI's use of the Foodtown marks, Foodtown's board of directors did not challenge or object to such use from 1994 through the date the by-laws were amended in 2000.

establish its trademark infringement or unfair competition claim under the Lanham Act.

The parties do not dispute that the Foodtown marks are valid and legally protectable.  See 15 U.S.C. § 1115(a) (stating that validity and legal protectability are proven, if a mark was federally registered).  The parties also do not dispute that Foodtown owns the marks at issue.  Moreover, Food King has not offered any evidence suggesting that NEI's and Norkus's use of similar marks, i.e. mark's conjoining "Foodtown" with other terms or phrases such as "Norkus Foodtown", is likely to create confusion concerning the origin of Foodtown's goods or services. See Freedom Card, Inc., 432 F.3d at 470; Kos Pharm., Inc., 369 F.3d at 708-09; Fisons Horticulture, Inc., 30 F.3d at 472.

The Third Circuit has adopted a non-exhaustive list of factors to consider when evaluating whether likelihood of confusion exists in a direct confusion case.  Freedom Card, Inc., 432 F.3d at 470-71.[8]  The factors are (1) the degree of similarity between the owner's mark and the allegedly infringing mark, (2) the strength of the two marks, (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase, (4) the length of

---

[8] These factors were originally set forth in Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 463 (3d Cir. 1983).  As a result, they are commonly referred to as the "Lapp factors".  See Kos Pharm., Inc., 369 F.3d at 709.

time the defendant used the mark without evidence of actual
confusion arising, (5) the defendant's intent in adopting the
mark, (6) any evidence of actual confusion, (7) whether the
goods, competing or not competing, are marketed through the same
channels of trade, and advertised through the same media, (8) the
extent to which the targets of the parties' sales efforts are the
same, (9) the relationship of the goods in the minds of
consumers, and (10) other facts suggesting that the public might
expect the larger more powerful company to (i) manufacture both
products, (ii) manufacture a product in the plaintiff's market,
or (iii) expand into the plaintiff's market.  Id. at 471.  The
Court must rely on those factors that are appropriate to the
given situation.  Kos Pharm, Inc., 369 F.3d at 709; see
Basketball Mktg. Co., Inc. v. FX Digital Media, Inc., 257
Fed.Appx. 492, 494 (3d Cir. 2007) (stating that different Lapp
factors may be accorded different weights depending upon the
factual setting).

Adding the word "Norkus" or the phrase "Your Hometown Grocer
Since 1935" creates a similar impression to using the Foodtown
marks alone.  See Fisons Horticulture, Inc., 30 F.3d at 478
(explaining that if the overall impression created by the marks
is essentially the same, they are likely confusingly similar).
However, this impression is intentional because NEI's stores are
part of the Foodtown cooperative, and thus, NEI may seek to

31

invoke the positive connotations associated with the Foodtown name.  Thus, the Lapp factors are not applicable here because Food King essentially asserts that NEI should not alter or add to the Foodtown marks, but instead, should use such marks exactly as they are.  NEI is not attempting to either confuse customers about the origins of its products or "palm-off" its products as the products of another entity, but instead, is simply attempting to indicate to customers and potential customers that it is a Member of the Foodtown cooperative.

The Lanham Act does not protect a situation where, as we have here, Members of a cooperative share a common source of goods and seek to use marks to collectively differentiate themselves from other stores that are not members of the cooperative.  Moreover, Food King has offered no support for its allegation that conjoining the Foodtown marks with "Norkus" or any other name or phrase actually confuses customers about whether the Members are separately owned and operated or whether NEI's stores are part of the Foodtown cooperative.  In fact, the only evidence Food King has offered in support of its claims that NEI's and Norkus's use of the Foodtown marks causes confusion are the unsupported testimony of Ginsberg and the certification of a single NEI customer.  (1st Food King Br., at 9.)  However, Ginsberg's unsubstantiated and hearsay assertions that Joseph Azzolina "has claimed harm cause by a Norkus Foodtown billboard"

and "an acquaintance of his son, Michael, was confused by the Norkus Infringement" are not sufficient to demonstrate a likelihood of confusion.  (Id.)  Also, the certification of a single NEI customer, Jodi Kiste, stating that the "Norkus Foodtown" logo made her think that "Foodtown had changed or had somehow merged or combined with a company named Norkus", does not, by itself, demonstrate that NEI's use of the Foodtown mark is likely to create confusion concerning the origin of Foodtown's goods or services, particularly at other Foodtown stores. (Undocketed Cicero Aff., Ex. B., Kiste Cert., at ¶ 3.)  See Freedom Car, Inc., 432 F.3d at 470 (stating that in order to prevail on a trademark infringement or unfair competition claim, the plaintiff must show that the defendant's use of the mark likely causes confusion concerning the origin of the plaintiff's goods or services).

NEI's and Norkus's use of the Foodtown marks in conjunction with "Norkus" does not constitute a false designation of origin or a misleading description of fact that would cause confusion as to the NEI store's affiliation or association.  Instead, it clarifies that NEI is the owner of this particular store that is, as indicated by the name "Norkus Foodtown", a Member of the Foodtown cooperative.  Additionally, the Court need not consider whether NEI's and Norkus's use of the Foodtown marks violated any version of Foodtown's by-laws because a violation of a

33

corporation's by-laws does not constitute a violation of the
Lanham Act.   Therefore, the Court finds that consumers viewing
NEI's and Norkus's use of the Foodtown marks would not assume
that their products or stores are associated with different
products or stores identified by a similar mark.   See Freedom
Card, Inc., 432 F.3d at 470.[9]   Accordingly, the Court will grant
both the Foodtown Defendants' separate motion and the part of
Laracca's separate motion for summary judgment on count 1 of the
second amended complaint.[10]

_____

[9] In light of our holding, the Court will not address
whether Food King was entitled to assert its Lanham Act claim
derivatively.

[10] Food King also asserts that NEI and Norkus have violated
Section 43(c) of the Lanham Act.   (See Amend. Compl., at 19-20.)
Section 43(c) provides in relevant part:

> the owner of a famous mark that is distinctive,
> inherently or through acquired distinctiveness, shall
> be entitled to an injunction against another person
> who, at any time after the owner's mark has become
> famous, commences use of a mark or trade name in
> commerce that is likely to cause dilution by blurring
> or dilution by tarnishment of the famous mark,
> regardless of the presence or absence of actual or
> likely confusion[.]

15 U.S.C. § 1125(c).   The key requirement of this section is that
the mark be famous, which is defined as "widely recognized by the
general consuming public of the United States as a designation of
source of the goods or services of the mark's owner."   Green v.
Fornario, 486 F.3d 100, 105 (3d Cir. 2007) (citing 15 U.S.C. §
1125(c)(2)(A)).   "This is a rigorous standard, as it extends
protection only to highly distinctive marks that are well-known
throughout the country."   Id.   Foodtown is a well-established
food cooperative in New Jersey, Pennsylvania and New York.   (See
2d Amend. Compl., at 6.)   Thus, while Foodtown's marks may be
widely recognized in the northeastern United States, they are not

34

**B.   Count 2 (Breach of Fiduciary Duty)**

Food King, in count 2, alleges that those defendants who are members of Foodtown's board of directors (the "Director Defendants") breached their fiduciary duties by, <u>inter alia</u>, (1) allowing Manyfoods to violate Foodtown's by-laws and submit a second agreement with WAL for the Members to consider under the right of first refusal, (2) determining that Food King had no right of first refusal with respect to the agreement between WAL and Manyfoods, (3) permitting Manyfoods to transfer its Foodtown Class A shares to a greater-than-10% equity owner in violation of Foodtown's by-laws, and (4) facilitating a breach by Manyfoods of its contract with Food King.  (2d. Amend. Compl., at 28, 31.) Food King asserts that the Director Defendants owed it the fiduciary duties of loyalty, good faith, and fair dealing.  (<u>Id.</u> at 31.)  Thus, Food King contends that the Director Defendants caused Food King to suffer special damages, namely denial of a prospective economic advantage, by breaching their fiduciary duties to Food King.  (<u>Id.</u> at 32.)

A director's relationship to the corporation and its shareholders is that of a fiduciary.  <u>Francis v. United Jersey Bank</u>, 432 A.2d 814, 824 (N.J. 1981).  Thus, shareholders can

---

widely recognized by the "general consuming public" throughout the country. Also, Food King has offered no evidence suggesting that the Foodtown marks have been in any way diluted.  Thus, Food King cannot assert a claim under Section 43(c) of the Lanham Act.

expect directors to exercise reasonable supervision and control over the corporation's policies and practices. Id.  The New Jersey Business Corporations Act, N.J.S.A. § 14A:1-1 et seq. (the "Act"), requires directors to "discharge their duties in good faith and with that degree of diligence, care and skill which ordinarily prudent people would exercise under similar circumstances in like positions."  N.J.S.A. § 14A:6-14(1). However, the Act provides certain "safe harbors" that automatically satisfy this standard.  Casey v. Brennan, 780 A.2d 553, 576 (N.J. App. Div. 2001).  One such safe harbor provides that directors are not individually liable if "acting in good faith, they rely upon opinion of counsel for the corporation". N.J.S.A. § 14A:6-14(2)(a); see Casey 780 A.2d at 576.

The Act also permits a certificate of incorporation to provide that the corporation's directors are not personally liable for breaches of duty, except for acts or omissions:

> (a) in breach of such person's duty of loyalty to the
> corporation or its shareholders, (b) not in good faith
> or involving a knowing violation of law, or (c)
> resulting in receipt by such person of an improper
> personal benefit.

N.J.S.A. § 14A:2-7(3); see N.J.S.A. § 14A:6-14(3) ("A director shall not be personally liable to the corporation or its shareholders for damages for breach of duty as a director if and to the extent that such liability has been eliminated or limited by the certificate of incorporation authorized by [section 14A:2-

36

7(3)].")   In accordance with the Act, Foodtown's certificate of
incorporation provides that its directors shall not be personally
liable for breach of any duty owed to the corporation or its
shareholders, subject to the exceptions listed in section 14A:2-7
of the Act.  (Dkt. entry no. 133-4, Gannon Cert., Ex. 11, 10-7-03
Foodtown Bd. of Dirs. Meeting Minutes, at 2.)  Thus, Food King's
breach of fiduciary duty claim is only viable if the Director
Defendants breached their duty of loyalty to Foodtown, failed to
act in good faith or knowingly violated a law, or obtained
improper personal benefits.  See N.J.S.A. §§ 14A:2-7(3), 14A:6-
14(3).

Food King alleges that the Director Defendants breached
their fiduciary duties by ignoring certain provisions in
Foodtown's by-laws, including the provisions relating to the
right of first refusal.  (Food King Br. in Opp. to Foodtown Defs.
Mot. for S.J. on Count 2 ("2d Food King Br."), at 4.)   The
Foodtown Defendants, in contrast, argue that the Defendant board
members acted in good faith and in a manner consistent with their
duty of loyalty, and made decisions based on Linkin's informed
and proactive advice, which they believed was consistent with the
by-laws.  (Foodtown Defs. Reply Br. in Support of Mot. for S.J.
on Count 2 ("2d Foodtown Defs. Reply Br."), at 4.)  Based on the
evidence presented by the parties, we find that the parties'
conflicting assertions preclude summary judgment because

questions of fact as well as issues of credibility and reliance
exist.  See Casey, 780 A.2d at 576 (stating that "[t]he degree to
which . . . individual defendants discharge their duties is a
factual determination").  Specifically, genuine issues of
material fact exist regarding whether (1) the right of first
refusal described in Foodtown's by-laws belongs only to Foodtown,
the corporate entity, or belongs to both Foodtown and its Members
(Foodtown 2d Stmt. of Facts, at ¶ 12 (stating that the right of
first refusal belongs only to Foodtown); Food King 2d Counter-
Stmt. of Facts, at ¶ 12 (stating that the right of first refusal
belongs to Foodtown and its Members based on statements by
Foodtown's counsel and implications from the by-laws themselves);
2d Food King Br., at 5; 2d Foodtown Defs. Reply Br., at 5), (2)
Linkin stated in a letter dated October 17, 2001 to Manyfoods
that Foodtown was waiving its right of first refusal "on an
anticipatory basis" (Foodtown 2d Stmt. of Facts, at ¶ 22; Food
King 2d Counter-Stmt. of Facts, at ¶ 22), and (3) Laracca, after
receiving the first WAL letter of intent, suggested to Ginsberg
that he should "get [his] lawyer today and go get something
signed right away from Manyfoods" because it would be good for
Food King to purchase the Cedar Knolls store (Foodtown 2d Stmt.
of Facts, at ¶ 36 (emphasis omitted); Food King 2d Counter-Stmt.
of Facts, at ¶ 36.)

38

Factual issues also exist with respect to whether certain of the Director Defendants were familiar with the by-laws, understood the provisions pertaining to the right of first refusal as being held by both Foodtown and its Members, and believed it was triggered by stock purchases as well as actual sales.  (2d Food King Br., at 4; 2d Foodtown Defs. Reply Br., at 2-4.)  See Francis, 432 A.2d at 822 (stating that directors are under a continuing obligation to keep informed about the corporation and cannot "shut their eyes to corporate misconduct").

The parties also offer factual support for their competing assertions regarding whether (1) Foodtown and Linkin treated the letters of intent from WAL and Pathmark as invoking the right of first refusal described in the Foodtown by-laws or whether the letters of intent were simply circulated so that Foodtown could determine its Members' interest in the particular store before deciding if it should waive the right of first refusal on an anticipatory basis (i.e., before an agreement was issued that would trigger the right of first refusal) (2d Food King Br., at 5-6 (arguing that Foodtown and Linkin treated the letters of intent as triggering the right of first refusal by circulating them with cover letters stating that if no Member was interested in purchasing the store, Foodtown could waive its right of first refusal); 2d Foodtown Defs. Reply Br., at 6-8 (arguing that

39

neither Linkin nor Foodtown treated the letters of intent as bona fide contracts invoking the right of first refusal)), (2) the November 26, 2001 meeting among Foodtown's president, Linkin, Ginsberg, and Michael Ginsberg, and the conversations occurring at such meeting essentially constituted an exercise of the right of first refusal by Food King with respect to WAL's letter of intent to Manyfoods for the purchase of the Cedar Knolls store (Food King 2d Counter-Stmt. of Facts, at ¶ 38; see Foodtown 2d Stmt. of Facts, at ¶ 38), and (3) during the November 27, 2001 meeting among the president of Manyfoods, Ginsberg, and Michael Ginsberg, Food King and Manyfoods reached an agreement for the sale of the Cedar Knolls store to Food King, and thus, this agreement coupled with Food King exercising its right of first refusal with respect to the WAL letter of intent precluded Manyfoods from continuing negotiations with any other party (Food King 2d Counter-Stmt. of Facts, at ¶ 40; see Foodtown 2d Stmt. of Facts, at ¶¶ 20, 41, 45 (noting that the December 7, 2001 agreement between Manyfoods and WAL triggered Foodtown's right of first refusal for the first time with respect to the sale of the Cedar Knolls store)).

The parties similarly dispute whether Linkin generally gave the Foodtown board members informed legal advice, and, with respect to the letters of intent, offered conflicting legal advice regarding whether the letters triggered the right of first

refusal provision in Foodtown's by-laws.  (2d Food King Br., at
8; see 2d Foodtown Defs. Reply Br., at 4 (asserting that the
Director Defendants acted in good faith and based their decisions
on the "informed proactive advice of Foodtown's counsel"), 10-11
(arguing that Food King's argument that Linkin's advice was
incomplete "evidences a fundamental misunderstanding of the By-
laws and the role of counsel").)  Last, Food King references
specific statements made by certain of the Director Defendants
during their depositions, which Food King argues suggest that the
Director Defendants failed to inform themselves of all material
information available to them before either voting to waive
Foodtown's right of first refusal with respect to WAL's purchase
of the Cedar Knolls store or determining that the right of first
refusal was not applicable to WAL's equity investment in
Manyfoods.  (See 2d Food King Br., at 14.)  In contrast, the
Foodtown Defendants offer evidence suggesting that the Director
Defendants were fully informed about all relevant facts necessary
to make their decisions, and made all of the decisions at issue
based on the advice of their counsel, Linkin, which is evidenced
in Linkin's numerous letters and memorandum discussing the right
of first refusal and its applicability to the proposed
transactions involving the Cedar Knolls store.  (See 2d Foodtown
Defs. Reply Br., at 4 (arguing that the Director Defendants gave
extensive consideration to these issues for approximately 4

months), 11-12.)  See Francis 432 A.2d at 823 ("A director is not
an ornament, but an essential component of corporate governance .
. . [and thus] a director cannot protect himself behind a paper
shield bearing the motto, 'dummy director'."); N.J.S.A. § 14A:6-
14(2)(a).  This Court concludes that genuine issues of material
fact exist with respect to whether the Director Defendants acted
in good faith and in a manner consistent with their duty of
loyalty to Foodtown and its Members in connection with the events
involving the Cedar Knolls store that culminated in the WAL
purchase of Manyfoods' equity shares in February 2002.
Therefore, we will deny the Foodtown Defendants' separate motion
and the part of Laracca's separate motion for summary judgment on
count 2 of the second amended complaint, which raises those
factual issues.

### C.   Count 3 (Shareholder Oppression)

Food King, in count 3, asserts that before the Defense Group
accepted the proposed settlement in the Twin County Action, Food
King requested an allocation of the settlement.  (2d Amend.
Compl., at 36.)  Food King contends that "[n]o allocation was
forthcoming, and [it] was obligated to settle the case prior to
determination of its allocation of responsibility."  (Id.)  Food
King further contends that despite its repeated dissents, the
Director Defendants, as well as a majority of the Foodtown
Members, approved proposals that (1) apportioned liability for

the defense and settlement costs accrued in connection with the
Twin County Action among the Defense Group members, (2) forgave
the Nicholas Markets $350,000 promissory note in favor of
Foodtown, (3) reallocated potential distributions in special
equity in Foodtown, and (4) allowed Foodtown to issue $3,400,000
in credits to cover duplicate general liability payments and
Local 1262 Health and Welfare payments.  (Id. at 38-39.)  Thus,
Food King asserts that Foodtown is a corporation with less than
25 shareholders, and the Director Defendants and Linkin
mismanaged Foodtown, abused their authority, and acted unfairly
and oppressively toward Foodtown in violation of N.J.S.A. §
14A:12-7.  (Id. at 42.)[11]

The Act permits a superior court to appoint a custodian or
provisional director, order a sale of a corporation's stock, or
enter a judgment dissolving a corporation if:

> [i]n the case of a corporation having 25 or less
> shareholders, the directors or those in control have
> acted fraudulently or illegally, mismanaged the
> corporation, or abused their authority as officers or
> directors or have acted oppressively or unfairly toward
> one or more minority shareholders in their capacities
> as shareholders, directors, officers, or employees.

---

[11] In count 3, Food King also notes that the Director
Defendants forgave a $24,000 promissory note from Nicholas
Markets arising from legal costs incurred during the Twin County
Action.  (Id. at 40.)  Food King asserts that this note was
submitted "in violation of prior Board resolutions requiring
unanimity, improperly evidences non-existing debt to Foodtown . .
., makes Food King jointly and severally liable for debt it never
incurred, and does not accurately reflect Food King's liability
under the Twin Count settlement."  (Id.)

N.J.S.A. § 14A:12-7(1)(c).  This provision recognizes that shareholders in closely-held corporations are uniquely vulnerable, and thus, need special protection.  Brenner v. Berkowitz, 634 A.2d 1019, 1027 (N.J. 1993).  However, allegations of mere discord among shareholders are insufficient to invoke this provision.  Id.

Oppressive conduct includes "that which frustrates the reasonable expectations of the minority shareholder." Muellenberg v. Bikon Corp., 669 A.2d 1382, 1387 (N.J. 1996). However, the minority shareholder's expectations must be balanced against the management of the corporation's ability to use their business judgment and run the business efficiently.  Id.  Thus, a minority shareholder must demonstrate more than fraudulent, illegal, or oppressive misconduct or abuse of authority to prevail under this statute.  Brenner, 634 A.2d at 1028.  Instead, the minority shareholder must "demonstrate a nexus between that misconduct and the minority shareholder or her interest in the corporation."  Id. (emphasis added).  In determining whether such a nexus exists the Court must consider those acts that affect a shareholder's stock interest, as well as those acts that are specifically targeted to the shareholder.  Id. at 1029. Therefore, "not all violations will cause a minority shareholder ascertainable harm", and thus, the Court must consider the seriousness of the alleged violations.  Id.

44

Foodtown has only 17 Class A shareholders, and thus, the shareholder oppression provision of the Act is applicable here. See N.J.S.A. § 14A:12-7(1)(c).  Moreover, Food King, a Foodtown Class A shareholder that is afforded one voting share, constitutes a minority shareholder under the circumstances here because it cannot direct outcomes and does not have any control over Foodtown's decisions and activities.  See Balsamides v. Protameen Chem., Inc., 734 A.2d 721, 732 n.7 (explaining that two 50% shareholders constituted minority shareholders because they could not direct outcomes as a 51% shareholder could, and did not control the corporation).  Nevertheless, the Court finds that Food King has not established its shareholder oppression claim against the Director Defendants.

Food King alleges that it has presented evidence demonstrating that the Director Defendants violated N.J.S.A. § 14A:12-7(c) by (1) "assess[ing] financial obligations against Food King that more than doubled the amount that Food King believed to be owed on the Twin County allocation", (2) forgiving the Nicholas Markets $350,000 loan obligation to Foodtown in exchange for its vote in favor of the proposed allocation of the defense and settlement costs arising from the Twin County Action, and (3) removing Ginsberg from the board of directors and preventing Food King's representatives from participating on any Foodtown committee.  (Food King Br. in Opp. to Foodtown Defs.

Mot. for S.J. on Count 3 ("3rd Food King Br."), at 8-10.)[12]  More
specifically, Food King alleges that the allocation among the
Defense Group was not fair or equitable, and was not an issue
that should have been addressed by Foodtown's board of directors.
(Food King 3rd Counter-Stmt. of Facts, at ¶ 29; see id. at ¶ 30
(arguing that Foodtown acted illegally when it passed the
September 10, 2002 resolution approving a final allocation among
the Defense Group in connection with the Twin County Action).)
Food King also alleges that the Director Defendants' forgiveness
of the Nicholas Markets promissory note was "not legally proper",
and their removal of Ginsberg from the executive committee was
improper.  (Id. at ¶¶ 88, 99; see id. at ¶ 94 ("Food King
maintains that this vote was an improper quid pro quo whereby
Nicholas Markets was released from his [sic] obligations to
Foodtown in exchange for his [sic] vote in favor of the proposed

---

[12] In its brief in opposition to the Foodtown Defendants'
separate motion for summary judgment on count 3, Food King also
argues that it has been "oppressed" by (1) the Director
Defendants paying dividends to some members but not others, as
well as paying "the remaining balance of qualified notice
dividends to one member, but not to others", (2) Foodtown
allowing certain Members to infringe its trademarks, and (3) the
Director Defendants participating in conduct that compromised the
financial stability of Twin County.  (3rd Food King Br., at 9.)
However, such arguments do not relate in anyway to the
allegations set forth in count 3 of the second amended complaint,
which addresses only Foodtown's forgiveness of the Nicholas
Markets loan and the Twin County Action defense and settlement
cost allocation.  Thus, the Court will not address these
arguments in analyzing Food King's shareholder oppression claim
in count 3, but will consider these arguments in addressing Food
King's other claims, as appropriate.

Twin County allocations"); id. at 101 ("Ginsberg's removal was improper retaliation by the Board for speaking up about things he discovered while in his position as CEO.").)

Such factual allegations, however, suggest only that the Director Defendants engaged in fraudulent or illegal conduct or abused their authority, and thus, are insufficient to support a shareholder oppression claim without an additional showing that a nexus exists between such conduct and any harm to Food King's interest in or expectations for Foodtown. See Brenner, 634 A.2d at 1028 (explaining that a minority shareholder must demonstrate more than fraudulent, illegal, or oppressive misconduct, or abuse of authority to prevail under the shareholder oppression statute). Food King has not shown that it or its stock interest was directly affected by the Director Defendants' alleged misconduct, which forms the basis of count 3, or that such conduct was in any way targeted at Food King. In fact, during his deposition, Ginsberg stated, "I don't believe that Food King itself was targeted [by virtue of the proposed allocation that ultimately was adopted], but we certainly were . . . [i]mpacted by the allocation" as other Members were negatively impacted by such allocation. (Dkt. entry no. 137-4, Gannon Cert., Ex. 26, 6-30-06 Ginsberg Dep. Tr., at 364-65 (explaining that he thought the Defense Group allocation was unfair but there were "members who were receiving a tremendous, tremendous benefit, and of

course they voted for it").)  Similarly, Michael Ginsberg stated during his deposition that he had no reason to believe that the Defense Group allocation, or decisions made in reaching this allocation, were in any way directed at harming Food King, but instead, "they were all just self-serving for each individual member for their position.  We were just the fall-out."  (Id., Ex. 7, 6-15-06 Michael Ginsberg Dep. Tr., at 228-29.)  Further, Foodtown's forgiveness of the Nicholas Markets $350,000 obligation to it affected all Foodtown Members equally, and Food King has not offered any evidence demonstrating that it was uniquely harmed by this decision of Foodtown's board or that its stock interest was somehow negatively impacted.  See Brenner, 634 A.2d at 1028.

Ginsberg's removal from the executive committee and board of directors, as well as the Board's decision to limit Food King's ability to participate in committee meetings once litigation seemed imminent, also cannot be considered oppression because such actions did not frustrate Food King's reasonable expectations.  See Muellenberg, 669 A.2d at 1387 (stating that "it cannot be considered oppression when controlling shareholders seek to rein in management and control the affairs of the corporation").  Instead, Food King and Ginsberg should have anticipated that their ability to participate in Foodtown's management and corporate affairs would be limited once the

48

relationship between the parties became adversarial, particularly once Food King commenced this action.  Thus, we conclude that Food King has not adequately alleged that a nexus exists between the Director Defendants' alleged misconduct, as described in count 3, and some negative impact on Food King or its interest in Foodtown.  See Brenner, 634 A.2d at 1028.  Any negative effects that may have resulted from the allocation of defense and settlement costs related to the Twin County Action have not been alleged to have been unique to Food King, but instead, would have been felt by all of the Members who voluntarily participated in the Defense Group.  Similarly, any negative effects that may have resulted from the Director Defendants forgiving the Nicholas Markets loan obligation would have been felt by all Members.  Therefore, Food King has shown no more than mere discord and disagreement between it and Foodtown's board of directors and certain of its Members.  See Brenner 634 A.2d at 1027.  This Court will grant the Foodtown Defendants' separate motion and the part of Laracca's separate motion for summary judgment on Food King's shareholder oppression claim, asserted in count 3 of the second amended complaint.

### D.   Intentional Misrepresentation (Count 4)

Although count 4 is entitled "Intentional Misrepresentation", Food King has stated that it actually sets forth a cause of action for shareholder oppression against the

Director Defendants.  (Food King Br. in Opp. to Foodtown Defs.
Mot. for S.J. on Count 4 ("4th Food King Br."), at 1.)
Specifically, Food King alleges that Foodtown and the Director
Defendants acted fraudulently illegally, mismanaged the
corporation, abused their authority, or acted oppressively or
unfairly toward it by (1) failing to allocate the general
liability insurance premiums based on substantiated sales even
though certain Member participants had misreported their actual
sales to Foodtown's insurance department, (2) director Peter
Lavoy assisting Harp in obtaining a credit to cover losses
incurred when there were intermittent outages on the
comprehensive loyalty marking system S&H Greenpoints, Inc.
("S&H") provides to Foodtown's Members, (3) giving credits to
Members required to distribute their own circulars without
receiving supporting documentation, and thus, causing the other
Members to subsidize these advertising costs, (4) failing to
fairly distribute the costs of promoting the Foodtown brand, the
weekly specials and circulars, and the S&H marketing system, (5)
failing to collect the "short term notice of compensatory
withdrawal fee" from Members selling or disposing of a store
without giving one-year notice as required by the by-laws, (6)
ignoring Food King's requests that Foodtown obtain collateral
from its Members as security for amounts such Members owe to
Foodtown, (7) failing to implement an ethics policy for

50

Foodtown's employees, officers, and directors, (8) paying dividends to some Members and not to others on at least two occasions, and (9) altering the reported quantities of manufacturer coupons when it was apparent that a Member intentionally reported fraudulent coupon quantities.  (2d Amend. Compl., at 43-52; see 4th Food King Br., at 6-8.)[13]

Foodtown, as noted above, has only 17 Class A shareholders, and thus, the shareholder oppression provision of the Act is applicable here.  See N.J.S.A. § 14A:12-7(1)(c).  Further, we previously determined that Food King, a Foodtown Class A shareholder that is afforded one voting share, constitutes a minority shareholder under the circumstances here because it cannot direct outcomes and does not have any control over Foodtown's decisions and activities.  See Balsamides, 734 A.2d at 732 n.7.  However, after viewing the evidence in the light most

_____

[13] In its brief in opposition to the Foodtown Defendants' motion for summary judgment on count 4, Food King emphasizes that the Director Defendants "stripped Food King's representative of their membership in committees, board positions, and their ability to oversee how the defendant [b]oard members were managing . . . the company."  (4th Food King Br., at 5-6 (noting that Foodtown's board of directors removed Ginsberg as chief executive officer of Foodtown, and prohibited Marc and Michael Ginsberg from participating on Foodtown committees).)  However, Food King does not discuss such allegations anywhere in count 4 of the second amended complaint.  Instead, such allegations are set forth in count 3, which also asserts a shareholder oppression claim and was addressed above.  The Court will not address these allegations again in analyzing the Foodtown Defendants' separate motion and the part of Laracca's separate motion for summary judgment on count 4.

favorable to Food King, this Court concludes that there is not sufficient evidence in the record to suggest that Foodtown or the Director Defendants acted fraudulently, illegally, abusively, or oppressively with respect to the decisions and conduct underlying count 4.  See N.J.S.A. § 14A:12-7(1)(c).  Instead, the record indicates that Foodtown's board of directors or executive committee fully considered all relevant information and properly voted before taking action or making each decision at issue.  Moreover, the Court agrees with the Foodtown Defendants that Food King's assertions that such acts constituted gross mismanagement, abuse of authority, and oppressive, wrongful conduct are unsubstantiated and conclusory.  (See 4th Food King Br., at 1; Foodtown Defs. Br. in Support of Mot. for S.J. on Count 4, at 9-10.)

Food King has not offered any evidence indicating that Members participating in Foodtown's general liability insurance program were misreporting their actual sales to reduce their insurance premiums.  (See Food King 4th Counter-Stmt. of Facts, at ¶ 16 (offering no citations or evidentiary support for statement that "Food King has consistently maintained that the submission of sales tax returns was waived to accommodate certain Members who had misreported their sales").)  Michael Ginsberg stated during his deposition,

> [a]t some point I kind of got a sense that some people were cheating on those [sales] reportings, just a

52

> sense.  That was my audit instinct coming out.  And I
> as the chairman [of the insurance committee] got the
> committee to agree that we should receive documentation
> of the sales that are being reported, substantiated
> with either an income tax return or a sales tax return.
> . . .  And Gerry [Norkus] said, you know what, why
> don't we waive it this year to avoid any embarrassment.
> So I have a good, strong suspicion people cheated, and
> I want it allocated the right way.

(Dkt. entry no. 139-4, Gannon Cert., Ex. 7, 6-15-06, Michael

Ginsberg Dep. Tr., at 236-37; see id., Ex. 10, 6-30-06 Ginsberg

Dep. Tr., at 404, 407-08 (stating that the tax return requirement

was waived for one year "so as not to embarrass those members

that could have possibly been giving deflated numbers").)

However, a "sense" or "suspicion" does not constitute sufficient

evidence to support Food King's allegation that Members engaged

in fraudulent conduct or that Foodtown's board members were aware

that such misconduct was occurring.  In fact, when Linkin asked

Ginsberg in April 2003 to provide any evidence suggesting that an

insurance program participant was lying, Ginsberg declined to

provide any evidence and simply reiterated his suspicions.

(Foodtown 4th Stmt. of Facts, at ¶ 18; Food King 4th Counter-

Stmt. of Facts, at ¶ 18.)

Food King also has not provided any evidence indicating that

Foodtown or Peter Lavoy acted improperly in encouraging PSK to

enter into its own contract with S&H. (See Food King 4th Counter-

Stmt. of Facts, at ¶ 26 (stating that Lavoy "should not have

encouraged" PSK to enter into its own contract with S&H but

"should have negotiated with S&H on behalf of all Members",
without explaining or providing support for why Lavoy's failure
to negotiate with S&H was in any way improper); id. at ¶ 30
(admitting that Foodtown eventually entered into a contract with
S&H that was separate from PSK's contract).)[14]   The Court does
not agree with Food King's argument that Foodtown "awarded a
benefit to" PSK by not guaranteeing that Foodtown received the
same deal from S&H that PSK had received.   (See Food King 4th
Counter-Stmt. of Facts, at ¶ 33.)   In fact, the Court does not
see how Foodtown, or Peter Lavoy in particular, had any control
over whether S&H agreed to provide Foodtown with the same
benefits that it had previously agreed to provide to PSK.   Thus,
Food King has offered no evidence suggesting that the Director
Defendants acted oppressively in connection with the S&H
contracts.

Food King also has not provided any evidence indicating that
the Director Defendants, or a specific board committee, acted
improperly in (1) assisting Harp in obtaining a network outage
credit from S&H (see Food King 4th Counter-Stmt. of Facts, at ¶¶
43-44 (simply arguing that Food King also complained about the
outages and resulting harm); dkt. entry no. 139-4, Gannon Cert.,
Ex. 7, 6-15-06 Michael Ginsberg Dep. Tr., at 245 (stating that

---

[14] This Court previously dismissed count 4 insofar as
asserted against PSK.   (Dkt. entry no. 92, 5-16-06 Ord.)

unlike Harp, Food King did not make a claim to S&H in connection
with the network outage because "we didn't even think it was
possible"))[15], (2) determining that $30 per thousand circulars
was a fair and reasonable credit to give to Foodtown stores that
handle their own circular distribution (Food King 4th Counter-
Stmt. of Facts at ¶¶ 52, 56 (explaining only that one
distribution company, CBA Industries, Inc., stated that
distribution could be accomplished for $20 per thousand
circulars, and thus, the $30 credits are excessive and unfair);
Foodtown 4th Stmt. of Facts, at ¶ 57 (explaining that Foodtown's
advertising committee reviewed and reconsidered the credits and
determined that the $30 credit per thousand circulars was fair
and reasonable); Foodtown Reply to Food King 4th Counter-Stmt. of
Facts, at ¶ 52 (stating that Ginsberg acknowledged that both PSK
and Harp objected to using CBA Industries, Inc. "because they
wouldn't do as good a job")), (3) establishing a method for
calculating the number of free circulars each Member receives
(see dkt. entry no. 139-4, Gannon Cert., Exs. 30-34, Bd. of Dir.
and Advertising Comm. Meeting Minutes from 2002 and 2003
(indicating that the Foodtown board of directors and the
advertising committee had been considering and discussing
Members' concerns about the formula for allocating free circulars

---

[15] The Court previously dismissed count 4 insofar as
asserted against Harp.  (Dkt. entry no. 123, 12-13-06 Ord.)

to the Members' stores, particularly low volume stores located in densely populated areas); id., Ex. 27, 8-31-04 Adv. Comm. Meeting Notes (discussing Member free circular entitlements and concluding that "the current calculation to determine a store's free circular quantity was fair and should continue")), and (4) determining whether a particular store was economically viable and should be required to pay the short notice compensatory withdrawal fee.

Food King similarly has not provided any evidence indicating that the Director Defendants, or a specific board committee, acted improperly in (1) determining that Members need not provide collateral to secure their loan obligations to Foodtown (see Food King 4th Counter-Stmt. of Facts, at ¶ 73 (providing no citations or documentary support for Michael Ginsberg's statement that Foodtown lost approximately $750,000 due to its failure to obtain collateral)), (2) deciding not to adopt an ethics policy for Foodtown (see dkt. entry no. 139-4, Gannon Cert., Ex. 16, 8-29-06 Norkus Dep. Tr., at 73 (stating, "I think under the advice of counsel [the executive committee] determined we didn't need to do anything" regarding the proposal that Foodtown draft an ethics policy)), (3) giving Members cash advances against declared patronage dividends that would otherwise be paid in the future (see Food King 4th Counter-Stmt. of Facts, at ¶ 85 (offering only Ginsberg's testimony on his subjective beliefs as evidence that

this was improper under the Internal Revenue Code)), and (4) engaging in coupon fraud (see Food King 4th Counter-Stmt. of Facts, at ¶ 88 (offering evidence suggesting that certain Members were involved in coupon fraud, but citing only Ginsberg's testimony and the second amended complaint in support of its allegation that Foodtown's board of directors altered coupon report quantities; see dkt. entry no. 139-4, Gannon Cert., Ex. 6, 8-31-06 Marc Ginsberg Dep. Tr., at 341-43 (discussing coupon fraud and his unsupported belief that criminal charges should have been brought, but noting that he did not believe Foodtown's board of directors was ever asked to act on any request involving the alleged frauds).

Food King, additionally, has not shown that Foodtown or the Director Defendants subjected it to disparate or oppressive treatment with respect to the decisions conduct underlying count 4.  See Muellenberg, 669 A.2d at 1387 (stating that the conduct underlying a claim under N.J.S.A. § 14A:12-7(1)(c) must amount to oppression of the particular shareholder, it cannot simply reflect disagreement or discord among shareholders); Brenner, 634 A.2d at 1028 (stating that there must be a nexus between the alleged misconduct and the minority shareholder or such shareholder's interest in the corporation).  Food King's principals, Ginsberg and Michael Ginsberg, have admitted that Food King was not targeted or uniquely affected by any of the

alleged misconduct underlying count 4.  (Dkt. entry no. 139-4,
Gannon Cert., Ex. 7, 6-15-06  Michael Ginsberg Dep. Tr., at 239
(stating that the Foodtown board of directors' decision to not
institute the tax return requirement until 2004 was not "directed
specifically at" Food King, but Food King was "indirectly"
harmed); id. at 330-34 (stating that (1) Food King is more
affected than other Members by Foodtown not having an ethics
policy because it is "way much higher on the ethics ladder than a
lot of our members . . . [a]nd I think ourselves and the members
who are more ethical are more damaged", (2) it is only "a belief"
that Food King is "affected more in some instances", and (3)
other Members were harmed, not just Food King but quantifying the
harm is difficult); id. at 256 (responding to question about
whether the board of directors' failure to require some Members
to submit financials on stores the Members intended to sell in
less than one year "somehow was aimed at harming Food King", by
stating "[n]ot directly.  It harms me as well as the other
members"); id., Ex. 6, 8-31-06 Marc Ginsberg Dep. Tr., at 306-310
(stating that Food King may have been affected differently than
other Members by the S&H network outage, but answering "no" when
asked whether Food King "was somehow targeted and affected more
specifically . . . because of the credit issued to Harp"); id.,
Ex. 10, 6-30-06 Ginsberg Dep. Tr., at 389-91 (stating that
"Foodtown and any other member" were harmed by the coupon

58

redemption issue and the circular credit issue, and responding
"yes" when asked whether the Foodtown board of director's failure
to act on the coupon redemption and advertising circular issues
had a financial impact on Food King as well as every other member
not benefitting from the alleged impropriety); Food King 4th
Counter-Stmt. of Facts, at ¶ 39 (stating that if PSK has a better
deal than Foodtown with S&H, then every Member except PSK is
being harmed), ¶ 62 ("Those Members who received excess circulars
and sold them to Members including Food King received a benefit
while others were harmed"), ¶ 58 ("All members operating stores
in New Jersey were targeted as the New York circular member
weekly advertising charges were calculated as a percentage of the
New Jersey charges.").)   Thus, Food King has not established a
"nexus" between the Director Defendants' allegedly oppressive
conduct and any harm felt by Food King.

Foodtown has actually grown and prospered during the time
frame at issue in count 4, and Food King received patronage
dividends during this period that were calculated in the same
manner as the dividends provided to the other Members.  (See
Foodtown 4th Stmt. of Facts, at ¶ 7.)   See Brenner 634 A.2d at
1033 (noting that "[n]one of the isolated incidents [at issue]
prevented the growth of the corporation or [the shareholder's]
investment in the company" but instead the company's growth
increased the shareholder's investment).   Thus, viewing the

evidence in the light most favorable to Food King, the Court finds that Food King has not established that (1) Foodtown or the Defendant Directors acted fraudulently, illegally, oppressively, or abused their authority with respect to the decisions and conduct underlying count 4, or (2) there is any nexus between the Director Defendants' alleged misconduct and Food King or its interest in Foodtown. See Brenner, 634 A.2d at 1028. Instead, Food King's allegations in count 4 reflect discord between it and the Director Defendants and certain of Foodtown's Members. Thus, the Court will grant the Foodtown Defendants' separate motion and the part of Laracca's separate motion for summary judgment on count 4.

**E.   New Allegations Pertaining to Laracca's Coupon Fraud**

Food King, on August 24, 2007, submitted a certification from its attorney pursuant to Rule 56(f), which stated, inter alia, that (1) Food King learned, on July 30, 2007, that Laracca and his brother were under investigation for participating in an alleged coupon fraud scheme at their Foodtown stores, (2) Laracca was a member of Foodtown's board of directors until he resigned on July 31, 2007, (3) Laracca "and other members of the Foodtown Board have engaged in a quid pro quo of misconduct, misusing and abusing their positions within the closely held entity for their collective and individual benefit, to Food King's detriment", and (4) the defendants have not disclosed the circumstances

60

surrounding Laracca's resignation, what the Foodtown board of directors discussed with respect to Laracca's alleged criminal conduct, or whether any of the defendants knew about Laracca's alleged misconduct.  (Dkt. entry no. 191, Kearney Cert., at ¶¶ 4-6, 8.)[16]  On September 24, 2007, this Court entered an order permitting Food King to obtain certain limited discovery pertaining to Laracca's coupon fraud.  (Dkt. entry no. 197, 9-24-07 Ord.)  Food King now asserts that "[t]he Laracca coupon fraud is directly related to Food King's causes of action".  (Dkt. Entry No. 205, Food King Br. in Opp. to Defs. Renewed Mots. for S.J. ("Food King Br. in Opp. to Renewed Mots."), at 1.)

Only count 4 of the second amended complaint contains any allegations pertaining to coupons.  (2d Amend. Compl., at 52 ("Foodtown has been acting as the clearinghouse for electronically delivered manufacturer coupons. . . .  Upon information and belief, several members reported intentionally fraudulent quantities of coupons.").)  However, the coupon allegations contained in count 4 relate to Members reporting false quantities of "electronically delivered manufacturer coupons" while, according to Food King, Laracca's criminal conduct related to "gang cut" paper coupons submitted to

---

[16] According to a local media report, Laracca and his brother told a New Jersey Superior Court judge that "between Nov. 1, 2002 and Oct. 31, 2006, they submitted an unspecified number of coupons to clearinghouses to obtain money they were not entitled to."  (Id., Ex. B, Rosenhaft Cert., at Ex. A.)

clearinghouses, other than Foodtown, for redemption.  (Food King
Br. in Opp. to Renewed Mots., at 7-10.)  Thus, the Court
concludes that any evidence set forth concerning Laracca's paper
coupon fraud and Foodtown's failure to address this fraud, does
not impact the Court's consideration of the pending separate
motions for summary judgment.  Instead, this evidence and the
arguments raised in Food King's brief in opposition to the
Foodtown Defendants' and Laracca's "renewed" motions for summary
judgment attempt to raise new allegations against Foodtown and
the Director Defendants, namely that they failed to (1) fine
Laracca after he pleaded guilty to the paper coupon fraud, (2)
investigate the paper coupon fraud, or (3) "take any action to
determine whether the fraud at the Laraccas' stores, or any other
store, is on-going, nor is it currently developing paper coupon
policies."  (Id. at 10-13.)

The Court finds that these allegations do not relate in any
way to the allegations and claims asserted in the second amended
complaint.  The Court also finds that Food King has not offered
any evidence suggesting that Foodtown or the Director Defendants
were involved or acquiesced in the Laracca criminal conduct,
which involved separate coupon clearinghouses not parties to this
action.  Accordingly, we conclude that the additional information
and evidence Food King has set forth regarding Laracca's coupon
fraud and the related investigations do not affect this Court's

analysis of Food King's claims in this action, as discussed in detail above.

## CONCLUSION

The Court, for the reasons stated _supra_, will (1) grant the Foodtown Defendants' motion for summary judgment on Food King's Lanham Act claim (count 1), (2) grant the Foodtown Defendants' separate motion for summary judgment on Food King's shareholder oppression claim (count 3), (3) grant the Foodtown Defendants' separate motion for summary judgment on Food King's intentional misrepresentation/shareholder oppression claim (count 4), (4) deny the Foodtown Defendants' separate motion for summary judgment on Food King's breach of fiduciary duty claim (count 2), (5) grant the part of Laracca's separate motion seeking summary judgment on Food King's Lanham Act claim (count 1), shareholder oppression claim (count 3), and intentional misrepresentation/shareholder oppression claim (count 4), and (6) deny the part of Laracca's separate motion for summary judgment on Food King's breach of fiduciary duty claim (count 2).  Thus, the only remaining claim is Food King's breach of fiduciary duty claim relating to the Manyfoods/Cedar Knolls store events in 2001 and 2002 (count 2), which is only asserted against the following Defendants: Norkus, Joseph Azzolina, Ronald Dickerson, Laracca, Peter Lavoy, Edward Paczkowski, Jack Pytluk, Michael Zimmerman,

Stephen Bosker, Sydney Katz, David Maniaci, and the estate of G.

William Michas, Jr.  The Court will issue an appropriate order

and judgment.


                     s/ Mary L. Cooper
                     **MARY L. COOPER**
                     United States District Judge

Dated: <u>August 15, 2008</u>